**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EQUAL EMPLOYMENT** | ) |
| **OPPORTUNITY COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )        **2:05-cv-404** |
| | ) |
| **NOVARTIS PHARMACEUTICALS** | ) |
| **CORPORATION,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Before the Court for disposition are DEFENDANT'S MOTION FOR SUMMARY

JUDGMENT (*Document No. 50*), with brief in support (*Document No. 52*), Plaintiff's

Memorandum in Opposition to Defendant's Motion for Summary Judgment (*Document No. 55*),

and the Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment

(*Document No. 61*).  After considering the filings of the parties, the evidence of record and the

relevant statutory and case law, Defendant's motion for summary judgment will be denied.


**Background**

Bethany Brandstatter ("Brandstatter") was hired by Novartis Pharmaceuticals Corporation

("Novartis") as a sales representative in April 2002.  (Doc. Nos. 51, p. 1, ¶ 1, 56, p. 1, ¶ 1).

Novartis apparently has four levels of sales employees.  (Doc. Nos. 51, p. 1, ¶ 2, 56, p. 1, ¶ 2).

Sales representative positions are considered to be entry-level positions.  *Id.*  The positions at the

other three levels, in ascending order, are sales consultant, senior sales consultant and executive

sales consultant positions.  *Id.*

Because she was an entry-level sales representative, Brandstatter attended Phase 1 Sales

Training during the first three weeks of her employment.  (Doc. Nos. 51, p. 2, ¶ 3, 56, p. 2, ¶ 3).

She needed to attend this mandatory training before starting to sell in the field.  *Id.*  This training

focused on priority products, selling skills, anatomy, physiology and diseases.  *Id.*  In July 2002,

1

Brandstatter attended Phase 2 Sales Training.  (Doc. Nos. 51, p. 2, ¶ 4, 56, p. 2, ¶ 4).  New employees typically undergo Phase 2 Sales Training two to three months after completing Phase 1 Sales Training.  Although the subject matter covered in both phases is generally the same, Phase 2 Sales Training provides a greater degree of depth in the areas of disease management, product management, physiology, and sales techniques.  *Id.*  Phase 2 Sales Training also covers clinical reviews and prescribing information.  *Id.*

Toward the end of August 2002, Brandstatter attended a sales meeting in Orlando, Florida, along with other sales representatives.  (Doc. Nos. 51, p. 2, ¶ 5, 56, p. 2, ¶ 5).  The meeting was in connection with the upcoming launch of Zelnorm, a new Novartis product.  *Id.*  At the meeting, Brandstatter's immediate supervisor, Ivory Gethers ("Gethers"), gave Brandstatter some negative feedback concerning her presentation.  *Id.*  Gethers apparently "failed" Brandstatter's presentation because she had exceeded the designated allotment of time, even though he did not fail another sales representative who had also exceeded the designated allotment.  (Doc. No. 56, p. 2, ¶ 5).

On or around September 3, 2002, Brandstatter filed an internal complaint with Novartis' Human Resources Department, accusing Gethers of subjecting her to sexual harassment and a hostile work environment.  (Doc. Nos. 51, p. 2, ¶ 6, 56, p. 2, ¶ 6).  Brandstatter's complaint was investigated by Joseph Palumbo ("Palumbo"), who worked for Novartis' Human Resources Department.  (Doc. Nos. 51, p. 3, ¶ 8, 56, p. 3, ¶ 8).  Gethers, who was responsible for evaluating Brandstatter's performance, would occasionally ride with her in the field and accompany her on calls to physicians' offices.  (Doc. Nos. 51, p. 5, ¶ 15, 56, p. 10, ¶ 15).  On December 9, 2002, Gethers placed Brandstatter on a Territory Coaching Plan ("TCP"), which explained the steps that she needed to take in order to improve her job performance.  (Doc. Nos. 51, pp. 5-6, ¶ 17, 56, pp. 12-13, ¶ 17).  Brandstatter responded to the TCP in writing.  (Doc. Nos. 51, p. 6, ¶ 18, 56, p. 13, ¶ 18).  Thereafter, having conferred with Gary Branch ("Branch"), Gethers revised Brandstatter's TCP.  *Id.*

On or around January 27, 2003, Brandstatter received a written performance evaluation from Gethers.  (Doc. Nos. 51, p. 6, ¶ 19, 56, p. 13, ¶ 19).  Gethers gave Brandstatter an overall rating of 2-1, or "Needs Improvement."  *Id.*  After receiving the evaluation, Brandstatter

2

contacted Maria LaRosa ("LaRosa"), who worked for Novartis' Human Resources Department. (Doc. Nos. 51, p. 6, ¶ 20, 56, p. 14, ¶ 20).  She told LaRosa that she believed that Gethers was treating her differently (i.e., giving her a bad performance evaluation) because she had filed a complaint against him for sexual harassment.  *Id.*  Brandstatter indicated that Gethers had mentioned her complaint against him twice, and that she felt uncomfortable riding with him because he was a large man.  *Id.*  Brandstatter made it clear to LaRosa that she did not agree with the performance evaluation.  *Id.*  After hearing from LaRosa about the matter, Branch spoke with Gethers.  (Doc. Nos. 51, p. 7, ¶ 21, 56, pp. 14-15, ¶ 21).  Branch also spoke with Brandstatter about the situation.  (Doc. Nos. 51, p. 7, ¶ 22, 56, p. 15, ¶ 22).  When asked by Branch whether she would be able to continue working with Gethers, Brandstatter responded in the negative.  *Id.* Although they discussed the possibility of her transferring to an open territory in either York or Carlisle (both of which were in Pennsylvania), Brandstatter decided that she was not interested in such a transfer.  *Id.*

Brandstatter contacted LaRosa again on March 7, 2003, complaining that she had not received an increase in her salary.  (Doc. Nos. 51, p. 7, ¶ 23, 56, p. 16, ¶ 23).  Gethers sent Brandstatter an email on March 18, 2003, stating that her TCP was scheduled to end on that day. (Doc. Nos. 51, p. 8, ¶ 27, 56, p. 18, ¶ 27).  In the same email, he indicated that her calls-per-day average was only 8.8, whereas the district goal was 10.  *Id.*  For this reason, he wanted her to continue to send him emails regarding her weekly calls.  *Id.*  On April 11, 2003, Gethers formally removed Brandstatter from the TCP.  *Id.*  Consequently, she was no longer required to send him her weekly calls.  *Id.*

On July 1, 2003, Branch accompanied Brandstatter in the field.  (Doc. Nos. 51, p. 8, ¶ 28, 56, p. 18, ¶ 28).  Brandstatter apparently never mentioned her concerns about Gethers on that occasion.  *Id.*  She took online, self-directed training courses, enabling her to learn more without spending time outside of her territory.  (Doc. Nos. 51, p. 9, ¶ 32, 56, p. 19, ¶ 32).  Nevertheless, she was apparently omitted from some training-related emails sent by Gethers to other sales representatives.  (Doc. Nos. 51, p. 10, ¶ 33, 56, pp. 19-20, ¶ 33).

Brandstatter went on short-term disability leave on August 1, 2003.  (Doc. Nos. 51, p. 10, ¶ 34, 56, p. 20, ¶ 34).  At some point during the summer of 2003, Brandstatter started to look for

a new job.  (Doc. Nos. 51, p. 10, ¶ 35, 56, p. 20, ¶ 35).  She ultimately accepted a job with Schwartz Pharmaceuticals, which was scheduled to begin in September 2003.  (Doc. Nos. 51, p. 10, ¶ 36, 56, p. 20, ¶ 36).  Brandstatter submitted her resignation to Novartis on August 29, 2003.  (Doc. Nos. 51, p. 10, ¶ 37, 56, p. 20, ¶ 37).  She never returned to Novartis after the commencement of her short-term disability leave.  *Id.*  Gethers is no longer employed by Novartis.  (Doc. Nos. 51, p. 11, ¶ 40, 56, p. 21, ¶ 40).

In April 2003, Brandstatter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been subjected to both sexual harassment and retaliatory animus after complaining about such harassment.  (Doc. Nos. 51, p. 11, ¶ 41, 56, p. 22, ¶ 41).  The EEOC commenced this action against Novartis on March 24, 2005.  (Doc. No. 1).  Brandstatter intervened on May 6, 2005.  (Doc. No. 9).  Brandstatter subsequently moved to Chicago, Illinois.  (Doc. Nos. 51, p. 11, ¶ 43, 56, p. 22, ¶ 43).  She entered into a settlement agreement with Novartis in January 2006.  (Doc. No. 51, p. 11, ¶ 44).  On February 14, 2006, the Court granted a motion filed by Novartis and Brandstatter seeking the dismissal of Brandstatter's claims against Novartis.  (Doc. No. 25).  Novartis responded by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), seeking the dismissal of the EEOC's complaint on the ground that there was no longer a live "Case" or "Controversy" within the meaning of Article III of the United States Constitution.  (Doc. No. 28).  The Court denied this motion in a memorandum opinion dated August 8, 2006, holding that Brandstatter's settlement agreement with Novartis, and the subsequent dismissal of her claims, did not deprive the Court of subject matter jurisdiction in this case.  *Equal Employment Opportunity Commission v. Novartis Pharmaceuticals Corporation*, 2006 WL 2290410, 2006 U.S. Dist. LEXIS 58307 (W.D.Pa. August 8, 2006).  At the request of Novartis, the Court amended the order denying Novartis' motion to dismiss in accordance with 28 U.S.C. § 1292(b), thereby allowing Novartis to seek an interlocutory appeal to the United States Court of Appeals for the Third Circuit with respect to the jurisdictional issue.  (Doc. No. 46).  The Court of Appeals denied Novartis' petition for leave to appeal on November 3, 2006.  (Doc. No. 48).

On January 8, 2007, Novartis filed a motion for summary judgment, which is currently pending before the Court.  (Doc. No. 50).  The EEOC opposes Novartis' motion for summary

4

judgment.  Briefing by the parties was completed on March 26, 2007.  It is Novartis' motion for summary judgment which is the subject of this memorandum opinion.

## **Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323.  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's

burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.  When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-250.

## Discussion

In support of its motion for summary judgment, Novartis essentially advances two basic arguments.  First, Novartis contends that since the EEOC now seeks only injunctive relief, the Court must dismiss the claim because the EEOC cannot obtain injunctive relief as a matter of law.  (Doc. No. 52, pp. 5-9)  Second, Novartis argues that no genuine issue of material fact exists as to whether its actions violated federal law in any event, thereby defeating any possibility of injunctive relief as a matter of law.  (Doc. No. 52, pp. 9-20)  The Court cannot agree with Novartis with respect to both arguments, and will proceed to address each of them *seriatim*.

The EEOC claims that Novartis' actions with respect to Brandstatter violated Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*].  Novartis first argues that the EEOC cannot demonstrate the "essential prerequisites" for injunctive relief, and that summary judgment should be granted in favor of Novartis for that reason.  (Doc. No. 52, pp. 5-9)  The relevant statutory provision provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).  The statute speaks in very clear terms.  The only *essential prerequisite* for the entry of injunctive relief in this case is a finding by the Court that Novartis has intentionally engaged in, or is intentionally engaging in, an unlawful employment practice charged in the complaint.  Such a finding, of course, would not entitle the EEOC to an injunction as a matter of law, since the statutory language speaks in permissive terms (i.e., by providing that the court *may* enjoin the relevant unlawful employment practice).  Nevertheless, a finding of intentional discrimination appears to be the only statutory prerequisite to the issuance of an injunction.

The Court's construction of the statute is consistent with the construction adopted by other federal courts.  In *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448 (6th Cir. 1999), the United States Court of Appeals for the Sixth Circuit explained:

> It is clear that the EEOC may obtain relief that protects a class of persons from unlawful employment discrimination without citing numerous instances of such discrimination.  While the right to such relief is not absolute, and the power to order it rests in the hands of the lower courts, the EEOC may seek it upon proof even of just one instance of discrimination that violates Title VII.  In seeking such relief, the EEOC need not identify a class or its numbers, or even identify a pattern or practice of discrimination.

*Frank's Nursery*, 177 F.3d at 468.  In *EEOC v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244 (11th Cir. 1997), the United States Court of Appeals for the Eleventh Circuit noted that "the EEOC is normally entitled to injunctive relief where it proves discrimination against one employee and the *employer* fails to prove that the violation is not likely to recur."  *Massey Yardley*, 117 F.3d at 1253 (emphasis added).  Other federal appellate courts have indicated that the burden is on the employer to demonstrate, upon a finding of intentional discrimination, that it is unlikely to violate Title VII again.  *EEOC v. Harris Cherin, Inc.*, 10 F.3d 1286, 1292 (7th Cir. 1993); *EEOC v. Goodyear Aerospace Corporation*, 813 F.2d 1539, 1544-1545 (9th Cir. 1987).  Admittedly, there is some authority indicating that, in circumstances where a single violation (rather than a pattern of violations) is found, the burden remains on the moving party (i.e., the EEOC) to establish that the employer is likely to engage in discriminatory conduct in the future.  *EEOC v. General Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989).  The allocation of the

burden, however, need not be determined at this stage of the proceeding.  Regardless of which party bears the burden, the decision to grant or deny an injunction, upon a finding of intentional discrimination, is committed to the sound discretion of the Court.  *Frank's Nursery*, 177 F.3d at 467-468 ("Thus, the EEOC may obtain such general injunctive relief, under the equitable discretion of the district court, even where the EEOC only identifies one or a mere handful of aggrieved employees.").  It would be premature for the Court to dismiss the EEOC's claim (under the guise of exercising its statutory discretion) without first determining whether Novartis did, in fact, engage in intentional discrimination.  *Harris Chernin*, 10 F.3d at 1292 ("It has not yet been determined whether, in fact, Chernin discriminated against Rosenthal, and whether, if it did, it acted willfully or under such circumstances that an injunction would be appropriate.  The EEOC is entitled to try to prove these claims if it believes it has a case.  Identification in the complaint of persons who might be protected by an injunction is not required.").

Novartis relies on *EEOC v. North Gibson School Corporation*, 266 F.3d 607 (7th Cir. 2001), for the proposition that injunctive relief is inappropriate where there is no identifiable discriminatory practice and no reasonable expectation that one will commence in the future. (Doc. No. 52, pp. 7-8).  Novartis' reliance on *North Gibson* is misplaced.  In *North Gibson*, the United States Court of Appeals for the Seventh Circuit noted that "[t]he EEOC's 'interests in determining the legality of specific conduct and in deterring future violations are distinct from the employee's interest in a personal remedy.'"  *North Gibson*, 266 F.3d at 620, quoting *Goodyear Aerospace*, 813 F.2d at 1542.  The Court of Appeals did not purport to limit the availability of the injunctive relief sought by the EEOC in the case.  Instead, *North Gibson* stands for the more narrow proposition that the EEOC cannot obtain injunctive relief which serves as the functional equivalent of a form of monetary relief unavailable to the aggrieved individual. *North Gibson*, 266 F.3d at 621 ("In the present case, the retirement benefits the EEOC seeks to obtain through injunctive relief for Anthis and Schleter serve the same function as an award of back pay.  The same considerations obtain whether the EEOC seeks this relief through monetary damages or through an injunction.  We see no reason, and the EEOC has offered none, why the EEOC should be able to obtain through an injunction what the courts have refused to grant it directly.").  The Court of Appeals also determined that a district court had correctly dismissed as

moot the EEOC's request for injunctive relief against the future use of a discriminatory early retirement plan. *Id.* at 621. Nevertheless, the EEOC had not even *suggested* that it had a reasonable expectation that such a discriminatory plan would be adopted by the defendant. *Id.* In the instant case, the EEOC has done more than simply *suggest* that Novartis' alleged conduct may be repeated. It has produced evidence that individuals currently employed by Novartis did not protect Brandstatter from Gethers' retaliatory conduct, and that they tried to persuade Brandstatter to transfer to York, Pennsylvania, because her working relationship with Gethers had deteriorated so badly. (Doc. No. 57-15, p. 16). Since no finding as to whether Novartis intentionally engaged in an unlawful employment practice has been made at this point, the Court has no occasion to exercise its statutory discretion to either grant or deny the injunctive relief sought by the EEOC. 42 U.S.C. § 2000e-5(g)(1). Accordingly, at this stage, it suffices to say that Novartis is not entitled to a favorable judgment as a matter of law with respect to the propriety of injunctive relief.

Where Congress has intended to provide for heightened statutory prerequisites to certain forms of relief, it has done so. 42 U.S.C. § 1981a(b)(1), for instance, provides for an award of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices *with malice or with reckless indifference to the federally protected rights of an aggrieved individual*." 42 U.S.C. § 1981a(b)(1)(emphasis added). Title VII's language conferring the discretionary authority on federal courts to grant injunctive relief upon a finding of intentional discrimination contains no prerequisite to such relief aside from the finding of an underlying violation itself. 42 U.S.C. § 2000e-5(g)(1). The statute requires only a finding that "the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint[.]" *Id.* Courts are not empowered to engraft onto statutes prerequisites to relief not intended by Congress. *Kolstad v. American Dental Association*, 527 U.S. 526, 534-535 (1999)(distinguishing between compensatory damages, which require only a showing of intentional discrimination, and punitive damages, which require an additional showing of malice or reckless indifference to an aggrieved individual's rights under federal law). Thus, Novartis is not entitled to a judgment as a matter of law unless it can show that no genuine issue of material fact exists as to whether it intentionally

9

engaged in an unlawful employment practice charged in the complaint.  It is that inquiry to which the Court now turns.

The allegations set forth in the complaint only concern those affecting Brandstatter. (Doc. No. 1).  The Court has already determined that, as a consequence of Brandstatter's settlement agreement with Novartis, the EEOC can no longer seek monetary damages for Brandstatter.  *Novartis*, 2006 WL 2290410, at *4, 2006 U.S. Dist. LEXIS 58307, at *13 ("The Court finds and rules that because Brandstatter's claim for damages has been completely resolved, it is necessary to hold that that part of the EEOC's claim which seeks damages for Brandstatter as an individual employee (i.e., victim-specific releif [sic]) is barred.").  Since the only Title VII violations charged in the complaint concern Brandstatter, however, the EEOC must establish that Novartis intentionally engaged in an unlawful employment practice with respect to her in order to trigger this Court's discretionary authority to issue injunctive relief.

The relevant portions of Title VII provide:

**§ 2000e-2.  Unlawful employment practices**

**(a) Employer practices.**  It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\* \* \*

**§ 2000e-3.  Other unlawful employment practices**

**(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.**  It shall be an unlawful employment practice for any employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment

practice by this title [42 U.S.C. §§ 2000e-2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e-2000e-17].

42 U.S.C. §§ 2000e-2(a), 2000e-3(a).  The relevant portion o

f the EEOC's prayer for relief provides:

Wherefore, the Commission requests that this Court:

A.  Grant a permanent injunction enjoining the Defendant Employer, its officers, successors, assigns and all persons in active concert or participation with it, from retaliating against employees who complain of such and in any other employment practice which operates to retaliate against employees.

B.  Grant a permanent injunction enjoining the Defendant Employer, its officers, successors, assigns and all persons in active concert or participation with it, from discriminating within any of its establishments between employees on the basis of retaliation.

C.  Order Defendant Employer to institute and carry out policies, practices and programs which provide equal employment opportunities for women, and which eradicate the effects of its past and present unlawful employment practices.

(Doc. No. 1).  It is clear that the EEOC is pursuing an injunction against retaliation under § 2000e-3(a), and not an injunction against violations of the substantive prohibitions contained in § 2000e-2(a).  To establish a *prima facie* case of retaliation under § 2000e-3(a), the EEOC must demonstrate: (1) that Brandstatter engaged in conduct protected under the statutory provision; (2) that Novartis took a materially[1] adverse action against Brandstatter; and (3) that there was a causal relationship between Brandstatter's protected conduct and Novartis' materially adverse action against her.  *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

In order to ascertain whether the EEOC can proceed in this action on the ground that Novartis unlawfully retaliated against Brandstatter within the meaning of § 2000e-3(a), the Court

---

[1]The United States Court of Appeals for the Third Circuit did not specifically refer to a "materially adverse" action in *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).  In this case, the Court has added that term in order to incorporate the standard adopted by the United States Supreme Court in *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

must first determine whether Brandstatter opposed an employment practice made unlawful under Title VII.  In this respect, the question of whether actionable retaliation occurred depends on whether the underlying practice opposed constituted an unlawful employment practice.  The United States Court of Appeals for the Third Circuit has held that an individual engages in protected conduct when she protests what she believes in good faith to be a prohibited practice.  *Aman v. Cort Furniture Rental Corporation*, 85 F.3d 1074, 1085 (3d Cir. 1996).  Hence, it is not necessary for the EEOC to establish that the conduct which Brandstatter opposed (i.e., sexual harassment) independently violated § 2000e-2(a).  It is sufficient for the EEOC to show that Brandstatter was acting under a good faith, reasonable belief that Gethers' comments constituted an unlawful employment practice.  *Griffiths v. Cigna Corporation*, 988 F.2d 457, 468 (3d Cir. 1993).

The Court understands Brandstatter's initial complaints about Gethers to Novartis personnel to be based on a "hostile work environment" theory.  To establish a violation of § 2000e-2(a) under this theory, a plaintiff must show that she endured harassing behavior sufficiently severe to alter the terms, conditions or privileges of her employment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  An isolated incident amounts to a change in the terms, conditions or privileges of one's employment only if it is "extremely serious."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The Supreme Court has admonished that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."  *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).  Title VII prohibits only those forms of sexual harassment severe or pervasive enough to create a hostile or abusive working environment.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147 (2004).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  With that in mind, the Court now turns to the comments allegedly made to Brandstatter by Gethers.

In her complaint in intervention, Brandstatter alleged three instances of harassing conduct on the part of Gethers which had prompted her to report him to Novartis' Department of Human

12

Resources.  The first incident allegedly occurred on June 18, 2002.  On that occasion, during a business-related telephone conversation between Brandstatter and Gethers, Gethers allegedly stated, "I bet you're a freak."  (Doc. No. 2, ¶ 13).  Brandstatter understood this comment to be a reference to her sexual behavior.  The next incident alleged occurred one month later.  During another business-related telephone conversation on July 19, 2002, Gethers allegedly asked Brandstatter, "Would you be offended if I said I wanted to fuck the shit out of you?"  (Doc. No. 2, ¶ 14).  The third incident alleged occurred on August 22, 2002, at a company event.  On that occasion, when Brandstatter introduced another female sales representative to Gethers, he allegedly replied, "Is she a present for me?"  (Doc. No. 2, ¶ 15).  The Court does not understand Novartis' position to be that these incidents did not occur.  Indeed, the record contains a letter from Branch to Gethers indicating that Gethers had engaged in inappropriate remarks and conversation "of a sexual nature," and that disciplinary action (including possible termination) would result if such conduct were to be repeated.  (Doc. No. 57-4, p. 6).  Thus, there is no question that the EEOC has sufficient evidence to create a triable issue of fact as to whether Gethers engaged in the alleged conduct.

Evidence supporting the allegations against Gethers, of course, does not answer the ultimate question.  These comments, though inappropriate in many respects, are not necessarily suggestive of a hostile or abusive working environment.  In *Clark County School District v. Breeden*, 532 U.S. 268 (2001), the United States Supreme Court held that a plaintiff cannot establish that she engaged in protected conduct under § 2000e-3(a) merely by showing that she complained about trivial jokes of a sexual nature.  *Breeden*, 532 U.S. at 271-272.  In *Breeden*, two male employees, in the presence of a female coworker, joked about the meaning of the following statement, which was allegedly made by an job applicant whose psychological evaluation report they were in the process of reviewing: "I hear making love to you is like making love to the Grand Canyon."  *Id.* at 269.  The comments were not directed at the female, but were simply intended to be a humorous response to what was contained in the particular applicant's psychological evaluation report.  The female, who was apparently offended by these comments, voiced complaints about the joke.  *Id.* at 269-270.  She later claimed that she was punished for doing so.  *Id.*  The Supreme Court concluded that she had no claim under § 2000e-

3(a), since no reasonable person could have believed that the comments by the male employees constituted a violation of Title VII's substantive provisions.  *Id.* at 271.

The circumstances of the instant matter are materially different from those in *Breeden*. On two occasions, Gethers allegedly made comments indicating that he had a sexual interest in Brandstatter.  His comment about another female sales representative possibly being a "present" for him does not strike the Court as particularly objectionable (at least for purposes of Title VII). Nonetheless, Gethers' alleged comments about Brandstatter's sexual habits, and his subsequent implication that he wanted to have sexual relations with her, differ meaningfully from the petty joke at issue in *Breeden*.  Gethers was Brandstatter's immediate supervisor, and the record indicates that he may have expressed a sexual interest in her on two separate occasions.  It may be that these incidents were not independently actionable under Title VII, and that Brandstatter's working environment was not sufficiently hostile or abusive to violate § 2000e-2(a).  A retaliation claim under § 2000e-3(a), however, can succeed even when no underlying sex discrimination actually took place.  *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 187-188 (2005)(Thomas, J., dissenting).  Although the Supreme Court has not specifically addressed the question, this Court is bound by the decisions of the United States Court of Appeals for the Third Circuit holding that an individual need only be under a reasonable belief that the conduct of which she complains violated Title VII (rather than establish that such conduct actually violated Title VII) in order to establish that she engaged in activity protected under the anti-retaliation provision of § 2000e-3(a).  *Aman*, 85 F.3d at 1085; *Griffiths*, 988 F.2d at 468.  Adherence to this rule is virtually uniform in other circuits as well.  *Crumpacker v. Kansas Department of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003); *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845, n. 1 (9th Cir. 2002); *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000); *Johnson v. University of Cincinnati*, 215 F.3d 561, 579-580 (6th Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Parker v. Baltimore & Ohio Railroad Company*, 652 F.2d 1012, 1019-1020 (D.C.Cir. 1981).

In her deposition, Brandstatter testified that some of her coworkers encouraged her to

14

inform Novartis' Department of Human Resources about Gethers' comments to her.  (Doc. No. 57-5, p. 19).  One coworker apparently stated that she would report Gethers' conduct towards Brandstatter herself if Brandstatter elected not to do so.  *Id.*  Given that Brandstatter was the recipient of implied sexual propositions from her immediate supervisor on two separate occasions, she may have been under the reasonable belief that Gethers' comments to her constituted a violation of Title VII.  This determination is reinforced by the seriousness with which her coworkers apparently viewed the situation.  The Court need not determine whether Gethers' comments were independently actionable under § 2000e-2(a) pursuant to a "hostile work environment" theory.  It suffices to say that the EEOC has sufficient evidence to create a genuine issue of material fact as to whether Brandstatter reasonably believed that Gethers' comments to her violated Title VII.  *Aman*, 85 F.3d at 1085; *Griffiths*, 988 F.2d at 468.  Any belief on the part of Brandstatter that Gethers' behavior was actionable cannot be properly characterized as objectively unreasonable, even if it is assumed *arguendo* that Gethers' implied sexual propositions were insufficiently hostile or abusive to constitute a violation of § 2000e-2(a).  Since all reasonable inferences must be drawn in favor of the EEOC at this juncture, the Court is convinced (for purposes of Novartis' motion for summary judgment) that Brandstatter's complaints about Gethers' implied sexual propositions constituted protected activity under § 2000e-3(a), and that she was entitled to statutory protection from retaliation.

It remains to be determined whether the EEOC has sufficient evidence of retaliation to establish a genuine issue of material fact as to whether Brandstatter's rights under § 2000e-3(a) were violated.  Novartis devotes a portion of its brief to refuting an argument that the EEOC does not make.  Novartis contends that the EEOC failed to plead a "hostile work environment" claim, thereby making such a claim as the basis for injunctive relief improper.  (Doc. No. 52, pp. 10-12).  The Court does not understand the EEOC to argue that injunctive relief should be granted with respect to Gethers' alleged creation of a hostile working environment for Brandstatter.  Instead, the EEOC seeks injunctive relief against Novartis to prevent future instances of retaliation.  (Doc. No. 1).  Since the EEOC is clearly not pursuing injunctive relief to prevent Novartis from permitting severe forms of sexual harassment to continue, there is no need to

address Novartis' argument as to that issue further.[2]  The Court's "hostile work environment" analysis is limited to the question of whether a reasonable employee in the position of Brandstatter could have believed that Gethers' implied sexual propositions violated Title VII. The Court answers that question in the affirmative.

With respect to the issue of retaliation, the applicable standard was enunciated last year by the United States Supreme Court in *Burlington Northern & Sante Fe Railway Co.*, 126 S.Ct. 2405 (2006).  In *Burlington Northern*, the Supreme Court explained that Title VII's anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."  *Burlington Northern*, 126 S.Ct. at 2409.  In order to advance its retaliation claim, the EEOC must demonstrate that the alleged retaliatory actions taken against Brandstatter "would have been materially adverse to a reasonable employee or job applicant."  The standard of *material* adversity is designed to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id.* at 2416.

Novartis argues that Gethers' alleged actions against Brandstatter were not materially adverse (i.e., that they would not have dissuaded a reasonable person in Brandstatter's position from complaining about Gethers' sexually harassing comments).  (Doc. No. 52, p. 13).  At this stage, however, the Court must view the evidence in the light most favorable to the EEOC, and Novartis bears the burden of establishing that no genuine issue of material fact exists as to this issue.  *Celotex*, 477 U.S. at 323.  With that in mind, the Court is convinced that the EEOC has presented sufficient evidence of materially adverse actions against Brandstatter to defeat Novartis' motion for summary judgment.

Branch sent Gethers a conduct memorandum dated October 7, 2002, chastising him for

---

[2]The Court's understanding of the EEOC's claim is buttressed by the fact that the EEOC alleges that, on February 4, 2003, LaRosa told Brandstatter that she had no basis for complaining because the "sexual" harassment had ceased.  (Doc. No. 1, ¶ 7(e)).  The EEOC apparently believes that Novartis acted appropriately to protect Brandstatter from harassment of a sexual nature.  The crux of the EEOC's argument is that Novartis did absolutely nothing to protect Brandstatter from Gethers' retaliatory conduct, which occurred after he learned of her complaints.  It is that issue that is before the Court, and Novartis' diversion to collateral matters cannot obscure the central issue in this case.

16

engaging in "inappropriate remarks" with members of his team, "some of which were of a sexual nature, on more than one instance."  (Doc. No. 57-4, p. 6).  Two months later, Gethers put Brandstatter under a TCP.  (Doc. No. 57-8, pp. 1-4).  Gethers' letter to Brandstatter contained the following sentence:

> Again, I must inform you that should you fail to meet the overall coaching plan objectives, or fail to sustain improvement following satisfactory completion of the coaching plan, we will have no alternative but to take further job action and place you on a Performance Improvement Plan.

(Doc. No. 57-8, p. 3).  Gethers listed several reasons for putting Brandstatter on a TCP.  He indicated that she had been ten minutes late for a meeting without leaving him a voicemail message, that she had made a pre-call outside of her car rather than inside of it, that she had failed to keep her computer battery charged, and that her calls per day was below the expected average.  (Doc. No. 57-8, pp. 1-3).  Brandstatter responded to Gethers' letter in writing.  (Doc. No. 57-8, pp. 5-7).  She stated that she had been late for a single meeting because of a traffic accident, and that another sales representative had also been late.  (Doc. No. 57-8, p. 5).  She further explained that her cellular phone was being repaired by AT&T, and that she had advised him of that after arriving late for the meeting.  *Id.*  According to Brandstatter, Jim Napoleon, the other sales representative who had arrived late, was never reprimanded in the way that she was. *Id.*  Brandstatter complained that her battery had not been charged because of a computer cord failure.  (Doc. No. 57-8, p. 6).  She indicated that she had been in the process of putting her computer in the trunk of her car while Gethers was asking her a question, and that she had made a call to a doctor while standing outside of her car because she was simultaneously attempting to retrieve on the computer the information needed to answer Gethers' question.  *Id.*  With respect to her average calls per day, Brandstatter explained that, as she understood the situation, sales representatives were given a grace period of six months to reach the national call average, and that she had not been afforded such an opportunity.  *Id.*

The Court has also been presented with notes taken by LaRosa about her conversation with Brandstatter on February 3, 2003.  (Doc. No. 57-15, pp. 14-16).  Brandstatter apparently told LaRosa that Gethers had accused her of acting in an unethical manner by complaining about

his sexually motivated comments.  (Doc. No. 57-15, p. 14).  According to Brandstatter, Gethers had indicated that she should have confronted him directly about his comments, and that complaining to the Human Resources Department demonstrated her immaturity.  *Id.*  A few weeks later, Brandstatter complained to Branch that Palumbo had failed to protect her anonymity when she complained about Gethers' sexually harassing comments.  (Doc. No. 57-15, p. 15).

LaRosa received a call from Brandstatter on March 7, 2003.  (Doc. No. 57-15, pp. 15-16).  On that occasion, Brandstatter indicated that she did not want to work with Gethers any longer.  (Doc. No. 57-15, p. 16).  He had apparently told her that she did not receive a merit increase in her salary because she was on a TCP, and because of her performance.  *Id.*  She was under the impression that he was retaliating against her because of her earlier complaints about his sexually harassing comments.  *Id.*  The record evidence indicates that Branch suggested that Brandstatter move to York, Pennsylvania, where Novartis had a vacancy.  *Id.*

Subsequent to those events, Gethers apparently made the decision not to recommend Brandstatter for any "2003 Sales Workshop 3" classes until he had a chance to meet with Branch.  (Doc. No. 57-23, p. 2).  He stated that Brandstatter's performance was "still deficient in some areas."  *Id.*  At that point, she was no longer on her TCP, which had ended on April 11, 2003.  (Doc. Nos. 51, p. 8, ¶ 27, 56, p. 18, ¶ 27).  The record reflects that Brandstatter did not receive certain training-related emails that Gethers had sent to other sales representatives.  (Doc. Nos. 51, p. 10, ¶ 33, 56, pp. 19-20, ¶ 33).

The record contains evidence that, as of August 1, 2003, Brandstatter was undergoing treatment for anxiety, depression, abdominal pain, nausea and vomiting.  (Doc. No. 57-8, p. 18).  She went on disability leave for this reason.  *Id.*  Her physician indicated that the cause of her medical problems was work-related.  *Id.*  Brandstatter, of course, never returned to her job at Novartis.  After accepting a job with Schwartz Pharmaceuticals, Brandstatter submitted her resignation to Novartis on August 29, 2003.  (Doc. Nos. 51, p. 10, ¶¶ 36-37, 56, p. 20, ¶¶ 36-37).

Brandstatter's testimony provides additional evidence of retaliation.  She testified that it was her understanding that, after "Phase 3 training," she would have the potential to receive a merit increase.  (Doc. No. 57-5, p. 3).  Nevertheless, she testified that Gethers expressly denied her a merit increase because of her complaints about sexual harassment.  (Doc. No. 57-5, p. 22).

18

She explained:

> Q.  Do you know when Mr. Gethers went to New Jersey to talk to people from Novartis about this issue?
>
> A.  No, I don't.  I could guesstimate it was sometime in late September, early October.
>
> Q.  Okay.  Subsequent to that occurring, did Mr. Gethers discuss the issue with him–your complaint with him?
>
> A.  I'm sorry.  I don't understand.
>
> Q.  Subsequent to Mr. Gethers being flown to New Jersey, did he bring up the issue with you about your complaints?
>
> A.  He did.
>
> Q.  Okay.  When did he do that?
>
> A.  It was a ride-along.  Well, I know that we discussed it when we were talking about merit increases during that ride-along when we rode along in October.  Or you know what?  It was when we rode along together in October.  He had gotten on me for–he told me that I had acted unethically by going to–no.  At this point, he had told me that I had acted in an immature fashion, and, "When you have issues dealing with the district, you go directly to the source of the problem." When we were discussing my merit increase, he had told me that I did not get a merit increase based that I had acted unethically by going to HR.  And again, "You deal with the source of the problem at the source of the problem rather than bringing in external people."

(Doc. No. 57-5, pp. 22-23).  Brandstatter also testified that, on one occasion, Gethers refused to get out of her car when she confronted him about his unfair treatment of her.  (Doc. No. 57-5, p. 7).  Thus, the record clearly reflects evidence upon which a reasonable trier of fact could conclude that Gethers retaliated against Brandstatter for her complaints about his sexually harassing comments.

Novartis attempts to deflect this evidence by pointing out that LaRosa and Branch determined that Gethers had legitimate, nondiscriminatory reasons for not awarding Brandstatter a merit increase.  (Doc. No. 52, p. 16).  Be that as it may, the Court cannot ignore Brandstatter's

testimony that Gethers actually told her, face to face, that she was not getting a merit increase *because* of her complaints to the Human Resources Department.  In order to defeat a motion for summary judgment, a plaintiff need not completely discredit every conceivable legitimate reason given by an employer for otherwise unlawful employment discrimination.  *Tomasso v. The Boeing Company*, 445 F.3d 702, 707 (3d Cir. 2006).  Even if Brandstatter's performance was not as good as Novartis expected, the record contains evidence which suggests that her deficient performance may have been due, in large part, to the health problems that she experienced because of Gethers' retaliatory conduct.  (Doc. No. 57-7, p. 21).  Brandstatter acknowledged in her deposition that her call numbers had dropped significantly during the fall of 2002.  *Id.* Nevertheless, she attributed that drop to her medical problems, which had apparently been brought on by Gethers' conduct.  *Id.*  The Court cannot conclude, at the summary judgment stage, that Novartis' decision not to give Brandstatter a merit increase was based on legitimate, nondiscriminatory reasons unrelated to retaliation.  It is also worth noting that Novartis is directly responsible for any tangible employment actions (i.e., the denial of Brandstatter's merit increase) allegedly taken by Gethers, since he was only able to take such actions because of his employment relationship with Novartis.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-762 (1998)("When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.").  Indeed, in this case, the evidence suggests that Novartis personnel may have deferred to Gethers' discretion as to such matters even after Gethers' alleged retaliatory motives were brought to their attention.  (Doc. No. 57-7, p. 19).  The EEOC clearly has sufficient evidence to create a triable issue of fact as to whether Brandstatter was denied a merit increase and training opportunities because of Gethers' retaliatory motives.  Novartis' argument to the contrary is simply unpersuasive.  (Doc. No. 52, p. 18)("Here, there is not a scintilla of evidence that Novartis' explanations for the challenged decisions as to Brandstatter are untrue.").

Novartis argues that even if Gethers' actions against Brandstatter were taken in retaliation for her complaints about his earlier sexually harassing comments, those actions were not *materially* adverse for purposes of the standard enunciated in *Burlington Northern* (i.e., they would not dissuade a reasonable person in Brandstatter's position from complaining to the

Human Resources Department about Gethers' implied sexual propositions).  (Doc. No. 52, pp. 13-15).  Novartis does not address the denial of Brandstatter's merit increase in this portion of its brief.  In *Burlington Northern*, the Supreme Court held that Title VII's anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington Northern*, 126 S.Ct. at 2409.  *Burlington Northern* abrogated the prior rule applicable in this circuit, which had confined actionable retaliation under § 2000e-3(a) to adverse employment actions directly impacting one's compensation, terms, conditions, or privileges of employment.  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).  The evidence presented by the EEOC is not only sufficient to satisfy the material adversity standard adopted by the Supreme Court in *Burlington Northern*, but also sufficient to satisfy the more stringent rule that had been applicable in this circuit prior to last year.  There is evidence which suggests that Brandstatter was denied a raise precisely because she complained about Gethers' sexual harassment.  If such evidence is ultimately credited, the EEOC will be able to establish that Brandstatter's compensation was directly impacted by Gethers' retaliatory conduct.  As the Supreme Court explained in *Burlington Northern*, Title VII's substantive provision seeks to prevent discrimination on the basis of a person's status, while Title VII's anti-retaliation provision seeks to prevent discrimination on the basis of a person's conduct (i.e., opposing an unlawful employment practice).  *Burlington Northern*, 126 S.Ct. at 2412.  Given this distinction, it is not clear whether retaliatory actions directly impacting one's compensation, terms, conditions, or privileges of employment constitute materially adverse actions as a matter of law, or whether it is possible for a tangible employment action to nevertheless fail to satisfy the standard of material adversity established in *Burlington Northern*.  In any event, however, the Court need not decide this broader question at this time.  While the substantive and anti-retaliation provisions contained in Title VII serve different functions, the actions prohibited by each are not mutually exclusive.  *Johnson v. The McGraw-Hill Companies*, 451 F.Supp.2d 681, 711 (W.D.Pa. 2006)("In holding that Johnson has failed to establish a *prima facie* case of retaliation with respect to Counts IV, V and VI, the Court does not hold that the same conduct cannot support both an underlying charge of discrimination and a distinct charge of retaliation.").  The denial of Brandstatter's merit increase in this case satisfies the material adversity standard,

since a reasonable employee may be dissuaded from complaining about sexual harassment if she knew that she would subsequently be denied a raise for doing so.

In her deposition, Brandstatter testified that, at one point, she started throwing up blood because of the anxiety caused by her employment situation at Novartis.  (Doc. No. 57-7, p. 21). She apparently underwent an endoscopy for diagnostic purposes.  *Id.*  She testified that she experienced both rapid changes in her weight and difficulty falling asleep.  *Id.*  Her testimony is corroborated by a statement from her physician which opined that her health problems were work-related.  (Doc. No. 57-8, p. 18).  In light of this evidence, the Court cannot conclude, at the summary judgment stage, that Gethers' alleged retaliatory conduct would not have dissuaded a reasonable person in Brandstatter's position from complaining about sexual harassment.

In its complaint, the EEOC alleges that Brandstatter was "forced to resign" because of Gethers' retaliatory conduct.  (Doc. No. 1, ¶ 7(l)).  Novartis apparently construes this allegation as an assertion that Brandstatter was constructively discharged.  (Doc. No. 52, pp. 18-20).  In its responsive brief, the EEOC does not make clear whether it is relying on a theory of constructive discharge in addition to a more generalized claim of retaliation, or whether it no longer intends to proceed on the basis of a retaliatory discharge theory.  (Doc. No. 55, p. 19).  The EEOC correctly notes that it need not establish that Brandstatter was constructively discharged in order to demonstrate that Novartis violated § 2000e-3(a).  *Id.*  To establish that Brandstatter was constructively discharged, of course, the EEOC would have to show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response."  *Suders*, 542 U.S. at 134.  The burden would then shift to Novartis to establish, as an affirmative defense, that it had a readily accessible and effective policy for resolving problems of the kind suffered by Brandstatter, and that Brandstatter unreasonably failed to avail herself of that policy.  *Id.*  Since the EEOC is only seeking injunctive relief at this stage, the question of whether Brandstatter was constructively discharged (as opposed to being subjected to materially adverse retaliatory actions insufficient to satisfy the intolerability standard required to establish a constructive discharge) appears to be moot for all intents and purposes.  To satisfy the statutory prerequisite for injunctive relief, the EEOC need only establish that Novartis intentionally engaged in an unlawful employment practice charged in the complaint.  42 U.S.C. § 2000e-5(g)(1).  It is not

necessary for the EEOC to establish that any intentional statutory violation on the part of Novartis was sufficiently severe to make Brandstatter's resignation "a fitting response." *Suders*, 542 U.S. at 134. Brandstatter and Novartis have now reached a settlement, thereby making the extent of Brandstatter's damages irrelevant to the inquiry. The Court need not address the question of constructive discharge further, since Novartis' motion for summary judgment must be denied even if it is assumed *arguendo* that the EEOC cannot establish that Brandstatter was constructively discharged. As far as the Court can tell, this is precisely why the EEOC does not specifically argue that its evidence is strong enough to make a showing of constructive discharge, opting instead to point out that such a showing is not necessary. (Doc. No. 55, p. 19)("In a retaliation claim, the Commission is not required to prove the elements of an underlying claim, such as the elements of a hostile work environment or constructive discharge, as Novartis appears to be arguing.").

The EEOC believes that injunctive relief is appropriate because the same Novartis employees who allegedly failed to protect Brandstatter from retaliation are likely to repeat such conduct in the future. It has presented evidence that Novartis personnel were not taking action to protect Brandstatter. Indeed, Branch's testimony indicates that he may have placed part of the blame on Brandstatter for her poor working relationship with Gethers. (Doc. No. 57-3, p. 25). Since the matter comes before the Court on Novartis' motion for summary judgment, the Court must resolve all disputed issues of material fact in favor of the EEOC. *Ely*, 590 F.2d at 66. Novartis cannot establish that injunctive relief is precluded as a matter of law, since the EEOC has sufficient evidence to create a triable issue of fact as to whether Novartis intentionally engaged in an unlawful employment practice. 42 U.S.C. § 2000e-5(g)(1). It is undisputed that Gethers is no longer employed by Novartis. (Doc. Nos. 51, p. 11, ¶ 40, 56, p. 21, ¶ 40). Novartis believes that Gethers' departure eliminates any reasonable possibility that it will violate § 2000e-3(a) in the future, since he is the one who allegedly retaliated against Brandstatter. (Doc. No. 61, pp. 4-5). In the Court's view, however, that question is relevant to the Court's *discretionary* decision to grant or deny injunctive relief, not to the question of whether the Court has the statutory *authority* under § 2000e-5(g)(1) to grant the EEOC's request for an injunction. Consideration of this issue would be premature, since no determination has been made as to

23

whether Novartis did, in fact, violate Title VII.  If an intentional violation is proven, the Court will have the *authority* to grant injunctive relief of the kind sought by the EEOC.  *EEOC v. Illona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997).  Such authority will be lacking, of course, if no intentional violation of Title VII is established.  If the EEOC is successful in its attempt to establish that Novartis' conduct constituted an intentional violation of § 2000e-3(a), the Court will proceed to determine whether any form of injunctive relief is appropriate at that time.  The Court will not attempt to exercise its discretionary authority to either grant or deny an injunction on the basis of a hypothetical violation which has not yet been established, but which could reasonably be established on the basis of the evidence presented by the EEOC.  *Harris Chernin*, 10 F.3d at 1292 ("In effect, this conclusion amounts to a decision that the facts which the EEOC may be able to prove will not justify issuance of an injunction.  This decision is premature.").  Accordingly, the Court must deny Novartis' motion for summary judgment.

### Conclusion

The EEOC has presented sufficient evidence to enable a reasonable finder of fact to conclude that Novartis' conduct with respect to Brandstatter constituted an intentional violation of § 2000e-3(a).  Such a determination would be the only statutory prerequisite to the injunctive relief sought by the EEOC.  42 U.S.C. § 2000e-5(g)(1).  The Court's decision to grant or deny injunctive relief upon a finding of intentional discrimination under § 2000e-3(a) is wholly discretionary, and the Court cannot appropriately exercise such discretion without first determining whether a violation of Title VII occurred.  Novartis cannot establish its entitlement to a judgment as a matter of law.  Consequently, the Court must deny Novartis' motion for summary judgment.  An appropriate order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS<br>CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:05-cv-404 |

## <u>ORDER OF COURT</u>

AND NOW, this 28th day of September, 2007, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Defendant's Motion for Summary Judgment (*Document No. 50*) is **DENIED**.

Plaintiff shall file its Pretrial Statement on or before **October 18, 2007**. Defendant shall file its Pretrial Statement on or before **November 7, 2007**. The Court shall conduct a Pretrial Conference on **November 9, 2007 at 2:30 P.M.** in Courtroom 6C, 6th Floor, U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania 15219.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:    Jacqueline H. McNair
Equal Employment Opportunity Commission
Email: Jacqueline.McNair@eeoc.gov

Judith A. O'Boyle
Equal Employment Opportunity Commission
Email: Judith.Oboyle@EEOC.gov

M. Jean Clickner
Equal Employment Opportunity Commission
Email: jean.clickner@eeoc.gov

Abigail D. Flynn-Kozara
Reed Smith
Email: aflynn-kozara@reedsmith.com

Martha Hartle Munsch
Reed Smith
Email: mmunsch@reedsmith.com

Kim W. Watterson
Reed Smith
Email: kwatterson@reedsmith.com