**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 05-cv-0404 |
| | ) | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On March 24, 2005, Plaintiff, Equal Employment Opportunity Commission

("EEOC") commenced this lawsuit by the filing of a Complaint against Defendant, Novartis

Pharmaceuticals Corporation ("Novartis") in which it seeks injunctive relief under Title VII of

the Civil Rights Act of 1964, as amended ("Title VII"). The sole allegation in this lawsuit is

that Novartis retaliated against its employee, Bethany Brandstatter, because she had engaged in

protected activity when she made a complaint against her supervisor. The EEOC is seeking

injunctive relief based on its allegations that the same Novartis employees who allegedly failed

to protect Ms. Brandstatter from retaliation are likely to repeat such conduct in the future. The

EEOC does not allege that any other employees were subjected to unlawful retaliation.

Novartis argues that the EEOC is not entitled to injunctive relief because it cannot

show that Ms. Brandstatter was retaliated against and, in the alternative, the EEOC cannot show

that there is any likelihood that Novartis will retaliate against any employees in the future.

On February 4 and 5, 2007, the Court conducted a non-jury trial and heard testimony and evidence. The transcript of the proceedings was filed on April 2, 2007. Proposed Findings and Fact and Conclusions were to be filed on or before May 2, 2008, and responses in opposition were to be filed on or before May 19, 2008, which were timely filed by all parties.

Based on the evidence and testimony presented during trial and the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons that follow, the Court finds in favor of Defendant, Novartis Pharmaceuticals Corporation.

## FINDINGS OF FACT

### General Background

1.  Bethany Brandstatter ("Brandstatter") commenced her employment with Novartis as a sales representative, an entry-level position, in April 2002. She worked in the Pittsburgh-area district.

2.  The job of sales representative involved calling upon doctors' offices to detail certain Novartis prescription drugs for the purpose of educating the doctors about those drugs and to encourage the doctors to prescribe the Novartis product rather than a competitor's product. In addition to visiting physician's offices, sales representatives were also expected to engage in other activities designed to promote access to physicians for the purpose of interacting and delivering information about Novartis' products.

3.    There were expectations set by Novartis regarding the numbers of physician calls that a sales representative was expected to make on a daily basis.  These expectations were established at the national, regional, and district levels.

4.    The activities of the sales representatives while in the field, such as preparing for and making their physician calls and documenting their activities in their call logs and post call notes, are important facets of a sales representative position.

5.    A sales representative is required to pre-call plan prior to entering a physician's office.  Pre-call planning involves analyzing data on the representative's computer and in his or her territory binder concerning the previous calls on that office as well as the physician's prescribing patterns to determine how best to sell Novartis' products.

6.    Sales representatives are provided with a list of target physicians.  These physicians are categorized as "Tier 1," "Tier 2," or "Tier 3," based on the volume of prescriptions which each doctor writes.  Tier 1 physicians are high-volume prescribers, while Tier 3 are low-volume prescribers, and Tier 2 fall in between.

7.    Sales representatives do not have offices.  They work in the field, and their performance is monitored by statistical information reflecting their activity in the field. District Managers periodically make field visits and conduct "ride along" training sessions with sales representatives on their physician calls to observe their performance in pre-call planning as well as their conduct in the physicians' office themselves.

8.    Brandstatter's immediate supervisor was Ivory Gethers ("Gethers"), District Sales Manager for the Pittsburgh North District.  Gethers had been newly hired by Novartis at about the same time as Brandstatter was hired.

9.      Gethers had twelve (12) sales representatives who reported to him, which were divided into six (6) groups of two (2), called counterparts.  The counterparts called on the same doctors, but separately and at different times.  Brandstatter's counterpart was William Simon.

10.      Gethers reported to Gary Branch ("Branch"), Regional Sales Director.  At the time Gethers was hired by Novartis, the Pittsburgh North District was Branch's worst performing district.  Accordingly, Branch put pressure on Gethers to turn around the performance of that district.

11.      According to Branch, he expected that Gethers would use the tools available to him to develop his sales representatives so that they could improve their performance, which would translate into better sales results for Novartis.

12.      One of the tools available for development was a Territory Coaching Plan or "TCP."

### Protected Activity Of Brandstatter

13.      Within four (4) months of being hired, on or about September 2, 2002, Brandstatter lodged an internal complaint with the Human Resources Department of Novartis in which she accused Gethers of subjecting her to a sexually offensive work environment.  The internal complaint was made against Gethers shortly after Brandstatter had been criticized by Gethers for a presentation she made at the Zelnorm launch meeting in Florida in August 2002.

14.      Specifically, Brandstatter complained that Gethers "exhibited a lack of professionalism," in that he had allegedly made approximately four (4) comments of a sexual nature over a period of three (3) months or so.

4

15.     Brandstatter's complaint was investigated by Joseph Palumbo ("Palumbo"), a Human Resources manager. Palumbo interviewed Brandstatter, as well as five (5) other sales representatives who reported to Gethers, including three (3) female representatives and two (2) male representatives. Palumbo kept detailed notes of these interviews.

16.     Based upon these interviews, Palumbo concluded that Brandstatter's allegations were generally supported by witnesses and that Gethers had used inappropriate sexual language on an individual basis and in group settings. Palumbo's investigation also revealed that Gethers had an "intimidating" management style.

17.     Also, as part of the investigation, Gethers was interviewed by Palumbo and Branch on October 2, 2002, in Novartis' corporate offices in New Jersey. At that meeting, Gethers was informed that a sexual harassment complaint had been lodged against him, the nature of the allegations, and that Brandstatter was the complainant.[1] Gethers was instructed that he must not engage in any retaliatory conduct and should not mention the complaint to his sales representatives.

18.     Following the meeting, Branch issued to Gethers a Conduct Memo, dated October 7, 2002, which stated as follows:

> The purpose of this memo is to outline behaviors currently below expectations, to review expected performance levels and to request your immediate action to correct these behaviors. This is a follow-up to the conversation on October 2, 2002.

---

[1]     Brandstatter testified that Palumbo promised that he would not disclose her name to Gethers during the investigation. However, Palumbo testified that he addressed this issue with Brandstatter and advised her that he could not thoroughly investigate her claim without disclosing her name.

Based on the investigation within your district that I requested of Human Resources, it was concluded by [sic] that you engaged in inappropriate remarks and conversations with members of your district, some of which were of a sexual nature, on more than one instance. This was further corroborated by our discussion with Joseph Palumbo on October 2, 2002.

It is expected that a DMI performs at the Intermediate level for the Communication competency. This includes monitoring others' reactions and addressing issues as appropriate, as well as, adapting your language and style to meet the needs of the audience.

Every individual in this corporation has the right to work in an environment free of harassment and intimidation. It is your responsibility as a District Manager to create that environment to insure the success of your team.

Ivory, I am confident we will not have any future occurrences. However, I must inform you that should there be a similar or related incident at any point in the future, we will have no alternative but to take further disciplinary action, up to and including termination of your employment.

Sincerely,
Gary Branch

Exhibit 11.

19.     The Court finds that Palumbo thoroughly and effectively investigated Brandstatter's allegations of sexual harassment.

20.     Brandstatter contends that upon Gethers' return to Pittsburgh after the October 2, 2002, meeting in New Jersey where he was advised of Brandstatter's harassment complaint, Gethers began to make intimidating and retaliatory comments to her. However, Gethers testified that Brandstatter's complaint about him to Human Resources did not influence any of his decisions or treatment of Brandstatter.

## Brandstatter's Territory Coaching Plan

21.     On or about December 8, 2002, Gethers issued a TCP to Brandstatter for a period of three (3) months.  Gethers testified that he issued the TCP because he had observed a cumulative decline in the performance of Brandstatter and was concerned about her concentration and dedication to her job.  Gethers testified that the  issuance of the TCP was needed because Brandstatter's daily average of physician visits was below the national average and the district's goal.  Specifically, the TCP instructed Brandstatter with respect to the organization and use of her territory sales binder, to ensure her equipment (laptop) was working before going into the field, to conduct pre-call planning inside her car, and to ensure timely attendance at meetings (or a phone call if she was going to be late).

22.     Gethers provided Brandstatter with clear coaching and instructions regarding how to address these concerns.  Namely, Gethers informed Brandstatter exactly what she should have in her territory binder and the equipment she should have with her on each of her calls. Gethers also reminded Brandstatter that she was required to ensure that her equipment was functioning prior to going into the field.

23.     Gethers also noted that Brandstatter's physician call average was below expectations, and reminded her of the importance of achieving the required call averages.

24.     The TCP also stated in relevant part, as follows:

> I sincerely want you to succeed as a productive member of our team.  I am
> confident that not only will you be able to demonstrate immediate
> performance improvement to a level where you meet expectations in each
> area specified in the Coaching Plan, but also, you will be able to sustain
> that improvement going forward.

> Again, I must inform you that should you fail to meet the overall coaching
> plan objectives, or fail to sustain improvement following satisfactory

completion of the coaching plan, we will have no alternative but to take
further job action and place you on a Performance Improvement Plan.

See Exhibit 12.

25.     A TCP is not a method of discipline; rather it is a developmental tool to

improve performance.

26.     Brandstatter responded in writing to the TCP and objected to many of the

observations made by Gethers in the TCP.   She copied her written response to both Palumbo

and Branch.  *See* Exhibit 13.

27.     Branch spoke with Brandstatter upon receipt of her response to the TCP.  She

informed him that she felt the TCP was unfair and repeated her concern that Gethers had been

advised that she was the earlier complainant, in spite of her request for anonymity.

28.     Branch reviewed the TCP and determined that the performance issues

addressed in it dealt with competencies and performance expected of all sales representatives in

his region.

29.     Palumbo contacted Gethers and advised him that he had not used the standard

Novartis template for a TCP.  He also informed Gethers that Novartis guidance prohibits a TCP

from being positioned as a "pre-PIP" (Performance Improvement Plan).

30.     Apparently in response to Palumbo's concerns, Gethers issued a revised TCP,

effective December 18, 2002; however, Gethers did not use the proper Novartis template nor

did he remove the forbidden language regarding possible placement of Brandstatter on a PIP

should her performance not improve.

31.     Gethers placed one of his other Sales Representatives, James O'Camb

("O'Camb"), on a TCP on December 31, 2002.  In the TCP issued to O'Camb, Gethers

included the same forbidden language regarding placing O'Camb on a PIP should his performance not improve.  *See* Exhibit 36.

32.     On June 27, 2003, Gethers placed O'Camb on a PIP "due to [his] unsatisfactory performance on the Territory Coaching Plan (TCP)."  *See* Exhibit 38.

33.     Gethers also placed William Simon, Brandstatter's counterpart, on a PIP on September 27, 2002.

34.     During a "ride along" in January 2003, Gethers provided Brandstatter with praise and positive feedback.  In the business development report that he prepared following the ride-along, Gethers explained to Brandstatter, "Today, you demonstrated better use and understanding of the DAM report by analyzing it during your precall and post call notes.  You have also improved probing and getting the physicians involved in discussion."  *See* Exhibit 57.

35.     On April 22, 2003, Brandstatter was taken off the TCP; thereafter, she was never placed on another TCP, was never placed on a Performance Improvement Program, and never received any disciplinary action while employed at Novartis.


**Brandstatter's 2002 Performance Evaluation**

36.     Gethers was responsible for preparing annual performance evaluations on all of his assigned sales representatives.

37.     On February 3, 2003, after receiving information from Gethers about his proposed rating (2-1) of her 2002 performance, Brandstatter contacted Maria LaRosa ("LaRosa"), a Human Resources Director, and complained that her performance was being rated unfairly by Gethers as he was retaliating against her because she had previously gone to

Human Resources with her harassment complaints. Brandstatter told LaRosa that Gethers had informed her that she would not be receiving a merit increase because she was on a TCP.

38.     Brandstatter told LaRosa that she was being subjected to retaliation by Gethers, that he was "building a case against her," that he had told her that she had "acted in an unethical manner in the fall;" and that "a mature rep goes to her manager instead of HR or over the manager's head."

39.     LaRosa informed Branch of the allegations made by Brandstatter because he was the Regional Director and, as such, would be familiar with the expectations and performance measures and competencies required of sales representatives at Novartis.

40.     Branch spoke separately with both Brandstatter and Gethers.

41.     Branch obtained the proposed performance evaluation from Gethers before it was finalized and given to Brandstatter for signature, reviewed it himself, and discussed it with LaRosa.

42.     Branch also asked Gethers about the alleged statements he had made to Brandstatter regarding her earlier complaint (e.g., "a mature rep doesn't go to HR"). Gethers denied making the alleged statements that Brandstatter had attributed to him.

43.     Both LaRosa and Branch concluded that the items Brandstatter had complained about were not unfair, but rather were fair and appropriate assessments of her performance in 2002.

44.     Both LaRosa and Branch found no evidence that Gethers had taken any retaliatory actions against Brandstatter and concluded that Brandstatter's retaliation complaint

against Gethers was not substantiated. They came to this conclusion in late February 2003, before the evaluation was given to Brandstatter for her signature on or about February 28, 2003.

45. The Court finds that LaRosa and Branch thoroughly and effectively investigated Brandstatter's allegations of retaliation.

46. The Court finds that Brandstatter's testimony that LaRosa advised her that because her sexual harassment complaints had been addressed, there was nothing Novartis could do about her claim of retaliation is not credible. LaRosa credibly testified that she did not make such a statement to Brandstatter. Further, the testimony of both LaRosa and Branch regarding the steps which they took in response to the retaliation complaint (including their notes which were offered and admitted into evidence at trial) refutes Brandstatter's allegation.

47. In February 2003, Gethers prepared his first and only written performance evaluation for Brandstatter for her performance during the calendar year 2002. *See* Exhibit 16. The performance evaluation form contains sections for the employee to self-evaluate him/herself and for the manager to rate the employee. In the "competency level assessment" sections, Gethers' ratings of Brandstatter were the same as Brandstatter's self-ratings in eight (8) of the ten (10) sections.

48. In the "Objectives" portion of the performance evaluation, Gethers' ratings of Brandstatter were the same as Brandstatter's self-ratings in two (2) of the five (5) sections.

49. Gethers noted in his evaluation that:

Brandstatter has a 2-1 overall rating which is needs improvement category due to her overall performance 3rd trimester. Bethany has been placed on a coaching plan to improve her performance. As her district manager, I am confident that Bethany will accept this overall rating as well as this coaching plan as a challenge and succeed within the Novartis organization and district.

50.     Gethers explained in his deposition the meaning of Brandstatter's "2-1"evaluation.  The 2 ("met expectations") was for her sales results, and the 1 ("partially met") was for her competencies.

51.     In the evaluation, Gethers identified the areas in which Brandstatter needed improvement:

> 1.  Communications needs improvement:  To check voice mails at least 3 times per day as well as responding / returning phone calls in a timely manner
>
> 2.  Results Focus:  To reach and exceed regional and national reach and frequency goals for Lotrel as well as Zelnorm and Famvir
>
> 3.  Call Reports:  Be prepared on all calls, including field contacts, with complete sales binder, functioning computer (power cord, charged battery).

*See* Exhibit 16.

52.     A sales representative who receives a "1" rating on either the sales results or competencies portion of the overall evaluation is not eligible for a merit pay raise.  Accordingly, Brandstatter did not receive a merit raise for her 2002 performance.

53.     Jim O'Camb, a similarly-situated employee who had not complained about Gethers, received an overall rating of 1-1 for 2002.


**Brandstatter's Application for Training Sessions**

54.     The EEOC alleges that Gethers' retaliatory conduct toward Brandstatter is also evidenced in the manner by which he rejected her attempts at self-improvement when she applied for training sessions.

55.     However, the Court finds that Novartis has articulated legitimate, non-retaliatory reasons as to why Brandstatter was not sent to those sales training programs.

56.     For example, the Phase III sales training would have required Brandstatter to be out of her territory for two (2) weeks.  Gethers testified that such a lengthy absence from her territory would be detrimental because she needed more time in the field to demonstrate her sustainability to achieve the required number of calls per day.

57.     Two other sales representatives in Gethers' district likewise were not sent to the Phase III sales training at that time:  Jennifer McLaughlin, who was ranked 502, and Angela Vermilya, who was ranked 401.  Brandstatter was ranked 454.

58.     Brandstatter also requested to attend the Mentoring and Critical Thinking course, which was to be held in the State of Washington.  Again, this course would have required Brandstatter to be out of her territory for a several days.  Moreoever, the class was for advanced representatives who would be mentoring others.

59.     Brandstatter also requested to attend a three-day Effective Selling class, which was open to Sales Consultants, not Sales Representatives.  Accordingly, Brandstatter was not eligible for that course.

60.     The EEOC did not present any evidence that Brandstatter ever mentioned anything about these training programs to LaRosa or Branch.


**Events Post Evaluation**

61.     Gethers participated in another "ride along" with Brandstatter on March 7, 2003.  Gethers attempted to end the ride-along because Brandstatter was questioning him about

13

the salary increases of other sales representatives. According to Gethers, Brandstatter yelled and screamed at him, called him "asinine," and told him to "go home to [his] wife and kids." Gethers Depo. at 87-89.

62. Following this field ride, Brandstatter again called LaRosa to once again complain about her performance rating and the fact that she had not received a merit salary increase. She did not raise any new issues with LaRosa.

63. In the meantime, Gethers had contacted Branch and told him about Brandstatter's behavior during the ride along on March 7, 2003. Based on that conversation, Branch concluded that the working relationship between Gethers and Brandstatter was perhaps beyond repair.

64. Branch considered the possibility of a transfer for Brandstatter and arranged for her to meet with Joe Hazelton ("Hazelton"), another District Manager, for possible transfer to a territory in York, PA.

65. Brandstatter met with Hazelton, and afterwards informed Branch that she was not interested in a transfer. Thereafter, Branch developed a strategy for moving forward to foster a constructive and productive working relationship between Brandstatter and Gethers.

66. In April 2003, Brandstatter filed a charge of discrimination with the EEOC in which she alleged that she had been subjected to both sexual harassment and retaliation after she complained about such harassment.

67. On July 1, 2003, Branch came to Pittsburgh and spent an entire day in the field with Brandstatter. Afterwards, Branch gave Brandstatter written developmental feedback.

68.     Brandstatter did not make any complaints about Gethers during the July 1, 2003 ride-along with Branch.

69.     Branch scheduled a meeting with Brandstatter, Gethers and himself, but Brandstatter cancelled the meeting.

70.     Brandstatter went on short-term disability leave on August 1, 2003.  At some point during the summer of 2003, she started to look for a new job.  She ultimately accepted a job with Schwartz Pharmaceuticals.  Brandstatter submitted her resignation to Novartis on August 29, 2003, and never returned to work at Novartis.

71.     Gethers resigned from Novartis on January 10, 2005.

72.     The EEOC commenced this action against Novartis on March 24, 2005. Brandstatter intervened in the lawsuit on May 6, 2005.   In her complaint in intervention, Brandstatter alleged three instances of harassing conduct on the part of Gethers which had prompted her to report him to Novartis' Department of Human Resources.

73.     Brandstatter subsequently moved to Chicago, Illinois.  She entered into a settlement agreement with Novartis in January 2006.  On February 14, 2006, the Court granted a motion filed by Novartis and Brandstatter seeking the dismissal of Brandstatter's claims against Novartis.


## CONCLUSIONS OF LAW

1.     The sole claim alleged by the EEOC in its Complaint is a claim for retaliation allegedly perpetrated by Gethers against Brandstatter in violation of Title VII, 42 U.S.C. §2000e-3(a).

2.    The alleged retaliatory acts at issue are limited to: (i) the issuance of the TCP to Brandstatter in December 2002; and (ii) the written performance evaluation given to Brandstatter in February 2003.

3.    The sole relief sought by the EEOC is injunctive relief pursuant to 42 U.S.C. § 2000e-5(g)(1), which provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

4.    The only essential prerequisite for the entry of judgment of injunctive relief in this case is a finding by the Court that Novartis has intentionally engaged in, or is intentionally engaging in, an unlawful employment practice charged in the complaint. Such a finding, however, would not entitle the EEOC to an injunction as a matter of law, since the statutory language speaks in permissive terms (i.e., by providing that the court may enjoin the relevant employment unlawful employment practice).

5.    The EEOC is pursuing an injunction against retaliation under § 2000e-3(a), which provides as follows:

**§ 2000e-3. Other unlawful employment practices**

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for any employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to

16

discriminate against any other member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a).

6.      To establish a *prima facie* case of retaliation under § 2000e-3(a), the EEOC must demonstrate: (i) that Brandstatter engaged in conduct protected by Title VII; (ii) that Novartis took a materially adverse action against Brandstatter; and (iii) that there was a causal relationship between Brandstatter's protected conduct and Novartis' materially adverse against her. *Burlington Northern & Santa Fe Railway Co. v. White*, -- U.S. ---, 126 S. Ct. 2504, 2415 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

7.      The EEOC seeks injunctive relief against Novartis to prevent future instances of retaliation.

8.      The EEOC's retaliation claims are analyzed under the familiar framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.

9.      If the EEOC establishes a *prima facie* case, the burden of production shifts to Novartis to articulate a legitimate, non-retaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802-803. An employer satisfies this burden by introducing evidence which would permit a trier of fact to conclude that retaliation was not the true reason for the employment actions at issue. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000).

10.     Once the employer meets its burden of articulating legitimate, non-retaliatory reasons for the challenged employment actions, the burden shifts back to the plaintiff, who must

17

prove by a preponderance of the evidence that the articulated reasons are not the true reasons for the employer's actions, but rather were merely a pretext for unlawful retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

11.    The Court finds and rules that EEOC has simply failed to present any credible evidence to show that Novartis took any retaliatory "adverse action" against Brandstatter because she engaged in protected activity, i.e., complaining to Human Resources about Gethers. Accordingly, the Court will grant enter judgment in favor of Novartis.

12.    However, assuming *arguendo* that the EEOC has established a *prima facie* case of discrimination, the Court would nevertheless enter judgment in favor of Novartis because the Court finds and rules that the EEOC has failed to adduce any evidence from which a reasonable factfinder could disbelieve Novartis' articulated legitimate, non-retaliatory reasons for placing Brandstatter on a TCP and for giving Brandstatter a "2-1" on her 2002 annual written performance evaluation. *See Fuentes*, 32 F.3d at 764.

13.    The credible evidence presented at trial clearly demonstrates that Novartis had legitimate, non-retaliatory reasons for placing Brandstatter on a TCP. The evidence shows that she was placed on a TCP due, in part, to her below average number of physician calls. Brandstatter was making 8.2 physician calls per day when the district expectation was 10.0 per day.

14.    In addition, Gethers observed other performance deficiencies of Brandstatter, *to wit*:  she had been late for a meeting and did not call Gethers to let him know she would be late; she did not organize and use her territory binder and DAM reports effectively; and she needed coaching with respect to her pre-call planning.

15.     The Court finds that the EEOC did not prove by a preponderance of the evidence that the legitimate, non-retaliatory reasons asserted by Novartis for placing Brandstatter on a TCP were a pretext for unlawful retaliation.

16.     The Court also finds and rules that Novartis has articulated legitimate, non-retaliatory reasons for giving Brandstatter a "2-1" on her 2002 annual written performance evaluation.

17.     Specifically, Novartis produced credible evidence at trial that in 2002, Brandstatter was not making the requisite number of physician calls, she needed to improve her communication skills by timely responding to voice mail messages, she was not effectively using her territory binder (including the DAM reports) and she did not appropriately conduct all of her pre-call planning.

18.     The EEOC did not prove by a preponderance of the evidence that these legitimate, non-retaliatory reasons were a pretext for discrimination.  Rather, the evidence offered by the EEOC in an attempt to prove pretext was refuted by credible evidence.

19.     Branch and LaRosa reviewed Brandstatter's performance review before it was presented to her.  They discussed the review and determined that the comments and ratings in the review were entirely justified and warranted based on her actual performance in 2002.

20.     Mr. Gethers also credibly testified that Brandstatter's internal complaints did not influence his rating of her 2002 performance.

21.     In conclusion, the Court finds and rules that the EEOC has not proven by a preponderance of the evidence that the legitimate, non-retaliatory reasons articulated by Novartis for Brandstatter having received a 2-1 evaluation were a pretext for unlawful retaliation.

22.    Accordingly, the Court finds that there is insufficient credible evidence to find that Novartis has intentionally engaged in, or is intentionally engaging in, an unlawful employment practice as charged in the complaint, *i.e.*, retaliation.

23.    Because the Court has ruled that the EEOC has not carried its burden on the merits of its retaliation claims, the Court does not need to reach the issue of whether the EEOC is entitled to any of its requested injunctive relief.

## CONCLUSION

For the reasons hereinabove set forth, the Court finds and rules that a verdict and judgment is hereby entered in favor of Defendant, Novartis  Pharmaceuticals Corporation, and against  Plaintiff, Equal Employment Opportunity Commission.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
                               )
               Plaintiff, )
                               )
               v. )      02: 05-cv-0404
                               )
NOVARTIS PHARMACEUTICALS )
CORPORATION, )
                               )
               Defendant. )

### ORDER OF COURT

AND NOW, this 15th day of October, 2008, in accordance with the foregoing

Findings of Fact and Conclusions of Law, is it **ORDERED**, **ADJUDGED, AND DECREED**

that a verdict and judgment in this action is hereby entered in favor of Defendant, Novartis

Pharmaceuticals Corporation, and against Plaintiff, Equal Employment Opportunity

Commission.

                                BY THE COURT:

                                s/Terrence F. McVerry
                                United States District Court Judge

cc:       Jacqueline H. McNair, Esquire
             Equal Employment Opportunity Commission
             Email: Jacqueline.McNair@eeoc.gov

             Judith A. O'Boyle, Esquire
             Equal Employment Opportunity Commission
             Email: Judith.Oboyle@EEOC.gov

             M. Jean Clickner, Esquire
             Equal Employment Opportunity Commission
             Email: jean.clickner@eeoc.gov

Rachel M. Smith, Esquire
Equal Employment Opportunity Commission
Email: rachel.smith@eeoc.gov

Abigail D. Flynn-Kozara, Esquire
Reed Smith
Email: aflynn-kozara@reedsmith.com

Martha Hartle Munsch, Esquire
Reed Smith
Email: mmunsch@reedsmith.com

Kim M. Watterson, Esquire
Reed Smith
Email: kwatterson@reedsmith.com